## Mahan v. McCloskey, Mayor

*D. P. Weimer*, for plaintiff; *Percy Allen Rose*, for defendant.

McKENRICK, J., July 10, 1933.—Plaintiff, Arthur T. Mahan, filed a bill in equity against defendant, Eddie McCloskey, Mayor of the City of Johnstown. The bill sets forth that the defendant is the mayor of the City of Johnstown, Cambria County, Pa., and that on May 8, 1933, said defendant notified the members of city council in writing that the plaintiff, Arthur T. Mahan, herein designated as civilian superintendent of police, had violated certain rules of

the police department, as a result of which he was suspended by the mayor. The bill further sets forth that after the suspension of the plaintiff the defendant appointed another to supervise and direct the activities of the police department of the City of Johnstown, and issued orders to all officers of the police department to disregard any commands or orders of the plaintiff. The bill further sets forth that the plaintiff is not a member of the Johnstown police force but is attached to the department of public affairs and is not subject to the civil service regulations prescribed by The Third Class City Law of June 23, 1931, P. L. 932, or the ordinances of the City of Johnstown. Plaintiff avers in his bill that under an ordinance enacted by the City of Johnstown he was employed by said city as civilian superintendent of police, to act as the agent of mayor and council in training, organizing, and supervising the activities of the members of the police department. The bill charges that the defendant has interfered with and interrupted the plaintiff in discharging his duties as civilian superintendent of police, in that the defendant has maliciously, capriciously, and vexatiously opposed practically all the plans or suggestions made by the plaintiff in the performance of his duties, so that the plaintiff is unable to carry out his plan in organizing, supervising, and training the police force, as provided by his contract. The bill further avers that the defendant unlawfully and maliciously intends to harass, annoy, and embarrass the plaintiff and thereby cause discredit, disfavor, and opprobrium to attach to his office and efforts to execute his duties as civilian superintendent of police. The bill prayed that a preliminary injunction might be issued restraining the said Eddie McCloskey, the defendant, as mayor of the City of Johnstown, or any other person acting under the mayor's orders, from attempting to suspend the plaintiff, and from hampering or interfering with him in the performance of his duties.

On filing of the bill in equity, the court issued a preliminary injunction as prayed for and fixed a time for the motion to continue said preliminary injunction. On the day of hearing, both plaintiff and defendant, with their counsel and witnesses, appeared before the court, and testimony was taken on behalf of the plaintiff. The defendant offered no testimony but took the legal position that the ordinance under which the plaintiff was employed is invalid and conferred no right upon the plaintiff to act as civilian superintendent of police. Decision upon the question whether the preliminary injunction should be continued until final hearing or dissolved was reserved, pending the filing of briefs by counsel representing both parties. The question before us for determination, therefore, is whether the preliminary injunction heretofore granted shall be continued until the case can be finally heard and determined in accordance with the equity rules and practice.

The City of Johnstown is a city of the third class and is therefore governed by the statutes relating to cities of the third class in this Commonwealth. Under The Third Class City Law of 1931, the executive and administrative powers are distributed into and among five departments, as follows: (1) department of public affairs; (2) department of accounts and finance; (3) department of public safety; (4) department of streets and public improvements; (5) department of parks and public property. Council designates one councilman to be director of each of the four last-mentioned departments. It is also the duty of council to determine the powers and duties to be performed by each department, to prescribe the powers and duties of officers and employes, and to assign particular officers and employes to one or more of the departments.

Section 1103 of the act designates the mayor as the director of the department of public affairs. By section 1202, the mayor is named as the "chief executive" of

the city. Under section 1203 we find the following: "It shall be the duty of the mayor to be vigilant and active in causing the ordinances of the city, and the laws of the Commonwealth relating to the government of the city, to be executed and enforced."

Section 1204 provides as follows: "The mayor shall supervise the conduct of all city officers, examine the grounds of all reasonable complaints against any of them, and cause all of their violations or neglect of duty to be promptly punished or reported to the council for correction."

Section 2001 provides as follows: "Appointment, Number, Rank, Compensation and Qualifications of Policemen.—The council shall fix, by ordinance, the number, rank and compensation of the members of the city police force, who shall be appointed in accordance with the civil service provisions of this act. . . . Council shall prescribe all necessary rules and regulations for the organization and government of the police force." Section 2002 provides as follows: "Designation of Chief and Other Officers.—The council may designate, from the force, the chief and other officers who shall serve as such officers until their successors are appointed and qualified." Section 2007 provides as follows: "Supervision by Mayor.—Policemen shall obey the orders of the mayor and make report to him, which report shall be laid by him before council whenever required. The mayor shall exercise a constant supervision and control over their conduct."

At the time of the enactment of the ordinance under which plaintiff claims his authority, there was no chief of police in the City of Johnstown. On December 9, 1932, the council enacted an ordinance providing that "Arthur T. Mahan be employed by the City of Johnstown as civilian superintendent of police to act as the agent of mayor and council in training, organizing, and supervising the activities of the members of the police department." The ordinance provided further, "It shall be his duty to see that the ordinances of the City of Johnstown and the laws of the Commonwealth of Pennsylvania are strictly enforced, and he shall make reports to council whenever required." Section 2 provides that implicit obedience shall be rendered by the members of the police force to the orders of Arthur T. Mahan as agent of mayor and council so long as such orders are not in conflict with any ordinance or Act of Assembly of the Commonwealth of Pennsylvania. Section 3 provides that Arthur T. Mahan shall not be a member of the Johnstown police force, but shall be attached to the Department of Public Affairs. Section 4 provides that his employment shall continue for 1 year at an annual salary of $3,000.

The defendant contends that this ordinance is unauthorized and void for the reasons that (1) it undertakes to create a public office not contemplated by the act of assembly; (2) it delegates to the incumbent duties, authority, and prerogatives vested in the mayor of the city under the creative acts of assembly; (3) it violates the act of assembly placing all police officers of such cities under civil service.

The plaintiff contends that he is not acting as a police officer and that his employment is justified by sec. 2403. This section, among other things, provides: "In addition to other powers granted by this act, the council of each city shall have power, by ordinance: ., . .

"3. Creation of Necessary Officers, Boards or Departments.—To create any office, public board, or department which it may deem necessary for the good government and interests of the city, and, unless otherwise provided by this act, elect the members of any board, bureau or commission; to prescribe the powers thereof, and to regulate and prescribe the terms, duties, and compen-

sation of all such officers, and of all officers who are members of any public board or any department so created," etc.

It is an erroneous theory that municipal corporations or the officers thereof may do anything not actually forbidden by law, which the caprice of councils or the executive officers may consider to be for the interests of the municipality. This is a mistake. "Nothing is better settled than that a municipal corporation does not possess and can not exercise any other than the following powers: (1) those granted in express words; (2) those necessarily or fairly implied in or incident to the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable. Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied: Dillon on Municipal Corporations, sec. 89": Lesley et al. v. Kite et al., 192 Pa. 268, 274.

In Pittsburgh's Petition, 138 Pa. 401, 430, section 18 of the Act of June 14, 1887, P. L. 395, providing as follows, "Such other departments shall be constituted and have such powers as may be conferred upon them by ordinance", was considered by the Supreme Court. In passing on this section of the act, the court held: "The eighteenth section authorizes the councils to create new departments in the city government and to define their powers. This cannot be sustained. The legislature must settle the system of government for each class of cities, and it must be the same for each and every member of each class. No city in any class can change the number of or the distribution of powers among the departments into which its government is cast by the legislature. If this were not so, no two cities in the same class would long retain the same form of municipal government, and general legislation for the class would, on many subjects, become impossible."

In Chapman v. Vandergrift Borough, 26 Dist. R. 301, the borough council passed an ordinance authorizing the creation of the office of "borough manager" of Vandergrift Borough, and in such ordinance defined the duties and tenure of office, and fixed the compensation, of the incumbent. While this is a lower court case, and not binding upon us as authority, Judge McConnell's very exhaustive and conclusive discussion of the principles involved impresses us, and we shall quote several parts of his opinion (p. 302): "On its face, this ordinance looks like an attempt by the municipal authorities to create an office not known to or defined by any statute under which the borough is supposed to be controlled. The title to the ordinance specifically declares that the creation of an office is the contemplated purpose of the ordinance, and the detailed provisions thereof are ancillary to the effecting of such a purpose." In discussing the question as to whether the officer known as "borough manager" in the ordinance is a public officer, Judge McConnell has this to say: " 'An office is a public station or employment conferred by the appointment of government. The term embodies the ideas of tenure, duration, emolument and duties:' United States v. Hartwell, 6 Wallace, 385. . . . 'Where an individual has been appointed or elected in the manner prescribed by law, has a designation or title given him by law, and exercises functions concerning the public assigned to him by law, he must be regarded a public officer:' Bradford v. Justices, &c., 33 Ga. 332. 'Where, by virtue of law, a person is clothed, not as an incidental or transient authority, but for such time as denotes duration and continuance, with independent power to control the property of the public, or with public functions to be exercised in the supposed interest of the people, the service to be compensated by a stated yearly salary, and the occupant having a designation or title, the position so created is a public office:' State v. Bren-

nan, 29 N. E. Repr. 593. 'A "public office" is a right, authority and duty created and conferred by law, by which an individual is invested with some portion of the sovereign functions of the government to be exercised by him for the benefit of the public. It implies a delegation of a portion of the sovereign power to and possession of it by the person filling the office. The source of the public office is found in the sovereign authority, speaking through constitution and statute, and the creations of the sovereign power cannot, in the absence of delegated authority, create one:' State ex rel. Stage v. Mackie [82 Conn. 398], 74 Atl. 759."

In the present case, the ordinance of the City of Johnstown provides that Arthur T. Mahan be employed by the city as civilian superintendent to act as the agent of mayor and council. He is given the title of "civilian superintendent of police", and among his duties are the training, organizing, and supervising of the activities of the members of the police department, and upon him devolves the further duty of seeing that the ordinances of the city and the laws of the Commonwealth are strictly enforced. While there is a distinction between an office and an employment, we think the ordinance creates an office, because the incumbent is given duties to perform which are, by the Act of Assembly, placed upon the mayor of the city. In the Vandergrift case, it was contended by the borough that the General Borough Act of May 14, 1915, P. L. 312, ch. 7, art. I, sec. 6, par. 7, authorized the appointment of a solicitor, one or two street commissioners, and such other officers as it may deem necessary. In the present case, the plaintiff takes the position that under the Act of 1931, supra, sec. 2403, council has the right to create any office, public board, or department which it may deem necessary for the good government and interest of the city. Quoting again from Chapman v. Vandergrift Borough, supra, p. 303, "When a borough enacts an ordinance it is exercising, or attempting to exercise, legislative power, and the authority for so doing must come from the Constitution and the laws of the Commonwealth. 'An ordinance is the product of legislative power conferred upon the municipality. One essential to its validity is that it shall not conflict with the law of the state:' 28 Cyc. 290. . . . 'A municipal charter . . . is a statute of the state and the organic law of the [municipal] corporation. . . . Any municipal ordinance in conflict with the charter is null and void. And so, also, is an ordinance outside of its charter powers, and persons assuming to act under its provisions will not receive protection from the courts:' 28 Cyc. 365, 366. This being true, in determining whether or not an ordinance is a valid exercise of legislative power, we are required to look, not simply at what the borough attempted to do, but also at whether its law-making power, in enacting the ordinance, has transcended the legal limits set for it by the paramount authority of the Commonwealth. . . . 'A municipal corporation cannot, in the absence of express authority, create an office, define its duties, appoint an incumbent and invest him with the powers of a municipal officer:' 20 Ency. of Law 1145." While it is true that a municipal corporation may provide for certain subordinate offices and the persons to fill them, it cannot create any office and fill it with an officer to whom is given authority expressly committed by the legislature to a corporate officer.

In the case of Benjamin et al. v. Webster, 100 Ind. 15, an act of the legislature provided that the chief engineer in the City of Indianapolis should have superintendence of the fire department of the city. The council, without any express statutory authority for so doing, attempted by ordinance to create what was denominated a "fire board" and to invest such board with some of the powers and duties which the statute had imposed upon the city engineer. It was held that "the attempt by ordinance to invest such fire board with powers

and duties which the statute imposed upon the common council, or upon the chief engineer of the fire department, and which could not be delegated, is a palpable violation of the statute, and, therefore, invalid and void."

In the case of Pinney v. Brown et al., 60 Conn. 164, 22 Atl. 430, an attempt was made by the selectmen of the town to create the office of "town agent", an office not designated or defined by law. The Supreme Court of that State decided that this could not be done: "There being no statute creating the office and defining the duties of 'town agent,' such an officer cannot be appointed by the selectmen in virtue of their general powers" (22 Atl. 430).

"The governing body of a municipal corporation is not at liberty to delegate to a committee or an officer or agent, governmental, legislative, or discretionary functions confided to it by the legislature of the state, in the absence of express authority for such delegation": 20 A. & E. Ency. Law (2d ed.) 1217.

The power conferred by section 2403 of the Act of 1931, supra, in the creation of offices is subject to the limitation that the duties of a statutory officer cannot be transferred to an official created merely by ordinance. Among the duties imposed by the statute upon the mayor are the following: To be vigilant and active in causing the ordinances of the city and the laws of the Commonwealth relating to the government of the city to be executed and enforced; to supervise the conduct of all city officers, examine the grounds of all reasonable complaints against any of them, and so forth; to supervise and control the conduct of policemen and exact obedience to his orders.

While the act of assembly does not in so many words provide that the mayor shall be the head of the police bureau or department, it does provide that policemen shall obey his orders. Nowhere in the act are policemen required to obey the orders of any person other than the mayor. Section 2001 of the act, however, gives council the right to prescribe all necessary rules and regulations for the organization and government of the police force.

What regulations has council prescribed? Ordinance No. 156 provides: "That the chief of police shall be the chief executive of the police department and he shall be under the direction and control of the chief executive of the city. Implicit obedience shall be rendered to his orders by all subordinate officers." Ordinance No. 204, sec. 1, amended Ordinance No. 156 to read as follows: "That the chief of police shall be the chief executive of the police department and he shall be under the direction and control of council." Ordinance No. 204, sec. 2, amended Ordinance No. 156 so that it reads as follows: "He (the chief of police) shall have power, with the approval of the mayor, to prescribe such rules and regulations for the drill, discipline, and management of the force as he may consider necessary. He shall have power to assign officers to their respective duties and make such changes in their assignments as his judgment may dictate, subject to the approval of council. . . ." Ordinance No. 153 relates to the qualifications of policemen and the management of the force.

These ordinances are cited to us as authority for the proposition that the mayor is not the head of the police force, and that in the absence of a chief of police the mayor's control over the police department is inoperative. The act of assembly does not prescribe the duties of the chief of police. The plaintiff does not contend that he is chief of police, and in the absence of such officer the sections of the various ordinances relating to his duties and powers are beside the question.

The act of assembly, sec. 2002, provides that "council may designate, from the force, the chief and other officers". Ordinance No. 153, sec. 2, provides that

"council shall . . . designate from the force the chief of police and other officers and fix their duties." Article xx, sec. 2001, provides that the council shall fix, by ordinance, the number, rank, and compensation of the members of the city police force, who shall be appointed in accordance with the civil service provisions of the act.

No person can be a member of the police force of the City of Johnstown unless appointed in accordance with the civil service provisions of the act of assembly. Under Ordinance No. 163, the chief and other officers must be members of the police force. The plaintiff, not being subject to civil service, is therefore not eligible to be either a police officer or the chief of police of the City of Johnstown. Regardless of whether there is a chief of police or a civilian superintendent of police, the statute says that policemen shall obey the orders of the mayor and make report to him.

It has been argued quite seriously that section 2007 of the act relates only to the personal conduct of policemen and that it does not apply to their activities while on duty. One sentence of this section, which provides that the mayor shall "exercise a constant supervision and control over their conduct", may be construed favorably to plaintiff's contention. While the conduct of policemen when off duty is a matter of public concern and subject to the supervision of the mayor, where their conduct might reflect unfavorably upon their comrades, as was illustrated by the Kerchenstein and Hoffman cases decided by this court, and affirmed by the Supreme Court, it would be a narrow and restricted view that would limit the supervision of the mayor and obedience to his orders to the period when the men were off duty. It is not reasonable to suppose that the mayor could regulate the personal tastes and desires, the entertainment, and social affairs of the members of the police force, and yet have no control over them when on duty, preserving order and enforcing the very laws which the mayor is bound under the statute to be vigilant in upholding. We find nothing in the act of assembly which requires policemen to take orders from members of council either as individuals or as a body. Certainly the law does not contemplate that members of council shall give orders to the policemen, for there may be as many orders given as there are members of council. Council may prescribe certain rules and regulations for the organization and government of the force, but the mayor, as chief executive of the city, must see that council's rules and regulations are enforced. We think the act of assembly means just what it says—that policemen shall take orders from the mayor, and while the mayor may transmit his orders through a chief of police or other officers the mayor is, in the last analysis, the directing power.

The office of civilian superintendent of police is not such subordinate office as is contemplated by section 2403 of the Act of 1931, supra. The office of civilian superintendent, as defined by the ordinance before us, vests in the civilian superintendent the right to train, organize, and supervise the activities of the members of the police department, and enjoins upon all members of the police force implicit obedience to his orders. While he is not a member of the police force and could not become chief of police without submitting to civil service regulations, he is in everything but name the chief of the Johnstown police force. It is made his duty to see that the laws of the Commonwealth and the ordinances of the city are executed and enforced. He is attached to the department of public affairs, of which department the mayor is, by statute, the director.

The complaint, in substance, is that the mayor interfered with the civilian superintendent by opposing all the plans or suggestions made by the superintendent. The testimony would indicate that the actions of the mayor were

exceedingly annoying to the superintendent, yet a fair reading of the testimony satisfies us that the superintendent carried out his plans notwithstanding the criticism of the mayor. Orders given to policemen were, to some extent, countermanded by the mayor. In the final analysis, whose orders are the policemen to obey? The statute says the mayor's orders, and if there is any conflict between the statute and the ordinance it is plain that the statute must govern. Let us assume, for the purpose of argument, that the superintendent, acting under authority of the ordinance, countermanded orders of the mayor and prevented him from performing his statutory duties. Would it be a sufficient answer on the part of the mayor, if charged with failure to enforce the laws, to say that that duty was by ordinance conferred upon another? The mayor is charged with the duty of causing the ordinances and laws to be enforced. The police department is the medium through which enforcement must be achieved. If the mayor is not permitted to give orders to the police, then the very means by which the end is to be attained is taken away. How can the mayor provide for the enforcement of the laws and ordinances if he is not permitted, except as one of five councilmen, to require their enforcement? The mayor, however, under the law is limited in his prerogatives. Council has power to fix the number, rank, and compensation of the members of the police force. As director of the department of public affairs, the mayor may suspend civil service employes of that department. Council alone has power to discharge. Whether council has the power to create the office of civilian superintendent of police of a city of the third class is not the question we are here deciding, although a discussion of that question is necessarily involved in the present proceeding.

Under the Act of June 25, 1919, P. L. 581, art. v, sec. 1, a director of public safety is provided for cities of the first class. The Act of March 7, 1901, P. L. 20, art. III, sec. 1, creates the office of director of public safety in cities of the second class. In both classes of cities mentioned, the mayor appoints the director, and he may be a civilian head of the police department. We cannot find in The Third Class City Law any authority for the appointment of a civilian as head of the police bureau. It may be within the power of council in a third class city to delegate to a civilian certain duties concerning the training of the members of the police force, and council may prescribe the necessary rules and provide for their enforcement. However, it is not within the power of council to create by ordinance any office that will clothe the incumbent thereof with prerogatives given by statute to a corporate officer. If a corporate officer can have his statutory authority diminished by degrees, it can be taken away entirely, and he would no longer exercise the functions of his office. We would then have the anomalous situation of an ordinance-created official functioning in the place of an official elected to perform duties cast upon him by the statute. The variety of such ordinance-created offices and the officers to fill them would be limited only by the number of third class cities in this Commonwealth.

The testimony indicates that the mayor and the civilian superintendent disagreed on questions of policy relating to the training of the police force. The mayor did not approve of certain things which the superintendent determined were necessary and proper instruction for the men. There is nothing in the law, as we understand it, to require all men to think alike on any question. The manner of objection to certain things is largely a question of temperament. Criticism, however harsh, is not an interference sufficient to invoke the arm of the law to restrain it. We can summarize the testimony in this case by saying that the only interference on the part of the mayor consisted in the countermanding of certain orders given by the superintendent and in the disapproval

of the plans and methods employed by the superintendent. That the mayor joined in this ordinance has nothing to do with the case. The duties and prerogatives cast upon a corporate official by statute cannot be evaded or diminished by his consent, either express or implied.

We, therefore, make the following decree:

And now, July 10, 1933, after due consideration, the preliminary injunction heretofore granted is dismissed at the cost of the plaintiff.

From Henry W. Storey, Jr., Johnstown, Pa.